UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DORETHEA JOHNSON,
     Plaintiff,


     v.                                    CIVIL ACTION NO.
                                           12-10808-MBB

INDYMAC MORTGAGE SERVICING,
     Defendant.



**MEMORANDUM AND ORDER RE:**
**PLAINTIFF DORETHEA JOHNSON'S MOTION TO STRIKE PARAGRAPHS 12**
**AND 26 OF THE AFFIDAVIT OF REBECCA MARKS (DOCKET ENTRY #**
**52); DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 38)**

**April 22, 2014**

**BOWLER, U.S.M.J.**

     Pending before this court is a motion for summary judgment

filed by OneWest Bank, FSB ("OneWest"), a nonparty to this

action.  The complaint names IndyMac Mortgage Servicing as the

sole defendant.[1]  (Docket Entry # 38).  Plaintiff opposes the

_____

     [1]  In an amended answer to the complaint, OneWest states
that it does business as IndyMac Mortgage *Services*.  Because
IndyMac Mortgage *Servicing* is the named defendant, plaintiff
Dorethea Johnson ("plaintiff") should seek leave to amend the
complaint to name OneWest as a defendant if she wishes to proceed
against OneWest.  In addition, "IndyMac Mortgage Services is a
division of OneWest and not a separate company."  (Docket Entry #
41, ¶ 13).  "[D]ivisions of companies are not separate legal
entities but, rather, are parts of the corporation to which they
belong" and are therefore subject to dismissal "as a matter of
law."  Raytheon Company v. ITT Corporation, 2013 WL 5450414, at
*1 (E.D.Tex. Sept. 30, 2013); see Spearing v. National Iron Co.,
770 F.2d 87, 89 (7th Cir. 1985) (noting that company, "being an
unincorporated division of Pettibone Corporation is not suable in
its own right"); see, e.g., Alloways v. Multiserv North America,

motion and separately moves to strike portions of an affidavit submitted in support of the summary judgment motion. (Docket Entry # 52). After conducting a hearing on March 5, 2014, this court took the motions (Docket Entry ## 38 & 52) under advisement.

## PROCEDURAL BACKGROUND

The complaint seeks injunctive relief and damages against IndyMac Mortgage Servicing to prevent a foreclosure on her property in Milton, Massachusetts and to modify a mortgage loan secured by a mortgage on the property. The complaint sets out the following claims: (1) breach of contract (Count I); (2) breach of the covenant of good faith and fair dealing (Count II); and (3) violation of Massachusetts General Laws chapter 93A, sections two and nine (Count III). (Docket Entry # 1).

In opposing summary judgment, plaintiff seeks to strike the following paragraphs in an affidavit by Rebecca Marks ("Marks"), a manager at OneWest: (1) "OneWest was required to obtain Deutsche Bank's approval of any permanent modification of Plaintiff's loan" (Docket Entry # 41, ¶ 12); and (2) "Deutsche Bank did not authorize OneWest to offer Plaintiff a Plan" (Docket Entry # 41, ¶ 26). Sufficient evidence in the summary record exists which renders the statements in these paragraphs

_____
2012 WL 346468, at *3 (D.Md. Feb. 1, 2012) (seeking leave to amend because plaintiff sued unincorporated subdivision of corporation).

cumulative.

As to paragraph 12, a servicing agreement originally between IndyMac Bank, F.S.B. and Goldman Sachs Mortgage Company ("the servicing agreement") requires "prior written consent" from the owner of the mortgage loan in order for the servicer to modify particular aspects of it.  During the relevant time period, Deutsche Bank national Trust Company ("Deutsche") was the owner and IndyMac Mortgage Services, a division of OneWest, was the servicer of the mortgage loan with respect to the servicing agreement.[2]  Including paragraph 12 in the summary judgment record would therefore not alter the decision to deny summary judgment.

Likewise, even if this court considered Marks' statement in paragraph 26, it would not change the decision to deny summary judgment.  As explained infra and construing the record in plaintiff's favor, as required, Deutsche did not authorize a trial period plan because IndyMac Mortgage Services never sought its permission to modify the loan at issue.  The motion to strike is therefore moot.

<u>STANDARD OF REVIEW</u>

Summary judgment is designed "'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'"  <u>Davila v. Corporacion De</u>

---

[2]  <u>See</u> fn. 13.

Puerto Rico Para La Difusion Publica, 498 F.3d 9, 12 (1st Cir. 2007). It is appropriate when the summary judgment record shows "there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." American Steel Erectors, Inc. v. Local Union No. 7, International v. Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 536 F.3d 68, 75 (1st Cir. 2008). "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Id.

Facts are viewed in favor of the non-movant, i.e., plaintiff. Noonan v. Staples, Inc., 556 F.3d 20, 23 (1st Cir. 2009). "Where, as here, the nonmovant has the burden of proof and the evidence on one or more of the critical issues in the case is not significantly probative, summary judgment may be granted." Davila v. Corporacion De Puerto Rico Para La Difusion Publica, 498 F.3d at 12 (internal quotation marks, citation and ellipses omitted); accord Clifford v. Barnhart, 449 F.3d 276, 280 (1st Cir. 2006) (if moving party makes preliminary showing, nonmoving party must "'produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue'" with respect to each element on which he "would bear the burden of proof at trial") (internal quotations marks and

4

citations omitted).  The summary judgment record sets out the
following facts.

_____Plaintiff lives in a single family residence at 45 Belvoir
Road in Milton ("the property").[3]  (Docket Entry # 53, ¶ 3).  On
May 12, 2004, she executed a promissory note ("the note" or "the
mortgage loan") for $440,000 to IndyMac Bank, F.S.B., a federally
chartered savings bank, the lender.  (Docket Entry # 40, ¶ 1).
On the same date, she executed a mortgage pledging the property
as security for the note.  (Docket Entry # 41, ¶ 2) (Docket Entry
# 61, p. 1).  The mortgage identifies IndyMac Bank, F.S.B. as the
lender.  (Docket Entry # 1-1, p. 1).

On July 11, 2008, the Office of Thrift Supervision ("OTS")
closed IndyMac Bank, F.S.B.  On the same date, the Federal
Deposit Insurance Corporation ("FDIC") was appointed as receiver
of IndyMac Bank, F.S.B.  (Docket Entry # 41, ¶ 6).  OTS then
chartered a new institution, IndyMac Federal Bank, F.S.B., and
appointed the FDIC as conservator.  (Docket Entry # 41, ¶ 7).
IndyMac Federal Bank, F.S.B. assumed servicing responsibilities
for the mortgage loan and the mortgage.  (Docket Entry # 41, ¶
8).

In March 2009, OneWest acquired substantially all of the

---

[3]  The property is also known as 165 Blue Hills Parkway in
Milton.  (Docket Entry # 40, ¶ 2).

assets and the mortgage servicing rights of IndyMac Federal Bank, F.S.B. from the FDIC. (Docket Entry # 41, ¶ 9). IndyMac Mortgage Services is a division of OneWest as opposed to a separate entity. (Docket Entry # 41, ¶ 13). In light of deposition testimony by Justin Rock ("Rock"), a vice president and regional outreach manager at OneWest, Deutsche is the owner of the loan.[4] In pertinent part, Rock testified as follows:

```
Q:  OneWest is the servicer of the loan.  Correct?
A:  That is correct.
Q:  Okay.  And who owns the loan?
A:  Deutsche Bank.
```

(Docket Entry # 57, Ex. D, pp. 2-3).

OneWest, and, in particular, IndyMac Mortgage Services, a division of OneWest, is therefore the servicer of the loan and the mortgage. (Docket Entry # 41, ¶ 11) (Docket Entry # 1-2, p. 1). The note required plaintiff to make monthly principal and interest payments beginning in July 2004. (Docket Entry # 40, ¶ 12) (Docket Entry # 61, p. 4) (Docket Entry # 53, Ex. A(1)). As of June 2009, it carried an adjustable interest rate. (Docket Entry # 53, Ex. A(1)). The note states that if plaintiff "did not pay the full amount of each monthly payment on the date it is due, [she] will be in default." (Docket Entry # 40, ¶ 13) (Docket Entry # 61, p. 4) (Docket Entry # 53, Ex. A(1)). The note also provides that, upon default, "the note holder may

---

[4] Plaintiff argues that there is no admissible evidence that Deutsche owns the mortgage loan.

require [plaintiff] to pay immediately the full amount of
principal which has not been paid and all the interest [owed] on
that amount." (Docket Entry # 40, ¶ 14) (Docket Entry # 61, p.
4) (Docket Entry # 53, Ex. A(1)).

In July 2009, plaintiff failed to make the monthly payment.
(Docket Entry # 40, ¶ 15) (Docket Entry # 61, p. 4) (Docket Entry
# 41, ¶ 5). On August 1, 2009, IndyMac Mortgage Services sent
plaintiff a notice of default stating that she had 90 days to
cure the default and, if she failed to do so, "the full balance
of the loan will be accelerated." (Docket Entry # 41-3).

In December 2009, IndyMac Mortgage Services mailed plaintiff
a solicitation letter as provided for under the Home Affordable
Modification Program ("HAMP").[5] On January 13, 2010, IndyMac
Mortgage Services sent plaintiff a Home Affordable Modification
Trial Period Plan ("TPP").[6] A letter accompanying the three page

---

[5] In 2008 Congress enacted the Emergency Economic
Stabilization Act of 2008, 12 U.S.C. §§ 5201–61, to "restore
liquidity and stability to the financial system" and ensure inter
alia the protection of home values and the preservation of home
ownership. 12 U.S.C. § 5201. The statute explicitly directed the
Secretary to issue "[p]rogram guidelines." 12 U.S.C. § 5211(d).
Specific to HAMP, section 5219(a)(1) "authorized the Secretary of
the Treasury to, inter alia, 'implement a plan that seeks to
maximize assistance for homeowners and encourage the servicers of
the underlying mortgages' to minimize foreclosures." Young v.
Wells Fargo Bank, N.A., 717 F.3d 224, 228 (1st Cir. 2013)
(quoting 12 U.S.C. § 5219(a)(1)) (internal ellipses omitted).
"To effectuate these goals, the Secretary created an array of
programs" including HAMP. Id.

[6] Language at the bottom of pages one and three of the TPP
states "Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3156."
(Docket Entry # 1-2). Rock also described the TPP as "a Fannie

TPP stated that, "If you qualify under the federal government's Home Affordable Modification Program and comply with the terms of the Trial Period Plan, we will modify your mortgage loan and you can avoid foreclosure." (Docket Entry # 41-4, p. 4). Paragraph 2(G) of the TPP explains that the:

> Lender[7] will not be obligated or bound to make any modification of the Loan Documents[8] if the Lender determines that [plaintiff does] not qualify or if [plaintiff] fail[s] to meet any one of the requirements under this Plan.

(Docket Entry # 41-4, ¶ 2(G)). Paragraph 2(E) provides that payments posted in compliance with the TPP do not "constitute a cure of [plaintiff's] default under the Loan Documents unless such payments are sufficient to completely cure" the entire default under the Loan Documents."[9] (Docket Entry # 41-4, p. 4).

On or about January 20, 2010, "[p]laintiff signed and returned the TPP to OneWest." (Docket Entry # 40, ¶ 22) (Docket Entry # 61, p. 6) (Docket Entry # 41, ¶ 22). In accordance with the terms of the TPP, plaintiff submitted monthly payments of $2,229.15 to OneWest from February to April 2010 on a timely

---

Mae/Freddie Mac uniform instrument that applies to all trial modifications in the HAMP program." (Docket Entry # 57, Ex. D).

[7] The TPP defines "a Lender or Servicer" as the "Lender" and the "Lender" as "IndyMac Mortgage Services, a division of OneWest Bank, F.S.B." (Docket Entry # 41-4, p. 1).

[8] The TPP defines the "Loan Documents" as the mortgage and the note. (Docket Entry # 41-4, p. 1).

[9] The discussion section sets out additional provisions of the TPP.

basis.  (Docket Entry # 40, ¶ 23) (Docket Entry # 61, p. 6)
(Docket Entry # 41, ¶ 23).

IndyMac Mortgage Services sent plaintiff three letters
requesting additional documents in January, March and May 2010.
(Docket Entry # 57, Ex. 8) (Docket Entry ## 41-5 & 41-6).  The
January 29, 2010 letter requested additional documents and
advised plaintiff that if she did "not qualify for a permanent
modification, we will not be able to modify your loan."  (Docket
Entry # 57, Ex. A(8)).  The March and May 2010 letters similarly
state that IndyMac Mortgage Services was in the process of
reviewing the application and required additional documents to
complete the review.  (Docket Entry ## 41-5 & 41-6).  These two
letters repeat that, "If you do not qualify for HAMP, we will not
be able to modify your loan."  (Docket Entry ## 41-5 & 41-6).

Rock testified that there was nothing in plaintiff's loan
file to indicate that plaintiff violated sections 2(F)(ii), (iii)
and (iv) of the TPP at any time.[10]  He was unable to conclusively

---

[10]  Section 2(F) states that:

If prior to the Modification Effective Date, . . . (ii) I
have not made the Trial Period payments required under
Section 2 of this Plan; (iii) the Lender determines that any
of my representations in Section 1 were not true and correct
as of the date I signed this Plan or are no longer true and
correct at any time during the Trial Period; or (iv) I do
not provide all information and documentation required by
Lender, the Loan Documents will not be modified and this
Plan will terminate.

(Docket Entry # 1-2, p. 2).

state from his review of the loan file whether plaintiff actually owed OneWest any documents except for an outdated hardship affidavit that plaintiff previously provided. (Docket Entry # 57, Ex. D). Rock also testified that, as far as he knew, it was fair to say that plaintiff was in compliance with the requirements imposed on her during "the modification process from the time that she first applied until July 16, 2010." (Docket Entry # 57, Ex. D).

Under the terms of the TPP, the trial period ended on May 1, 2010, which is also "the 'Modification Effective Date.'"[11] (Docket Entry # 1-2, p. 2, ¶ 4). The TPP further states that, "This Plan shall terminate the day before the Modification Effective Date," i.e., April 30, 2010.[12] (Docket Entry # 1-2, § 3).

By letter dated July 16, 2010, IndyMac Mortgage Services informed plaintiff of the denial of a permanent loan modification. The letter explained that, "[W]e have determined that your loan does not qualify for HAMP due to our contractual obligations with the owner of your loan." (Docket Entry # 41-7). Although not stated in the letter, Deutsche was the owner of the loan at the time. As previously indicated, Deutsche has a

---

[11] See fn. 23.
[12] To the extent that plaintiff implicitly asserts that she complied with the TPP by making monthly payments of $2,229.15 after May 2010, her position is misguided.

servicing agreement with IndyMac Mortgage Services.[13]  In

pertinent part, the servicing agreement reads as follows:

> [T]he Servicer may not, *without prior written consent of the Owner*, (i) permit any modification with respect to any Mortgage Loan that would change the Mortgage Interest Rate . . ., the Lifetime Rate Cap (if applicable), the Initial Rate Cap (if applicable), the Periodic Rate Cap (if applicable), or the Gross Margin (if applicable), (ii) defer or forgive the payment of any principal or interest, (iii) reduce the outstanding principal amount (except to reflect actual payments of principal), (iv) except other than pursuant to terms of the Mortgage Loan, make any advances of additional principal or (v) extend the final maturity date on such Mortgage Loan.

(Docket Entry # 57, Ex. C, p. 16) (emphasis added and underlining

omitted).  The servicing agreement therefore expressly required

IndyMac Mortgage Services to obtain "prior written consent" from

Deutsche to permanently modify the mortgage loan if, for example,

a modification reduced the monthly payments and thereby extended

the final maturity date.  Plaintiff's loan was part of a pool of

---

[13]  The February 2004 servicing agreement was originally between IndyMac Bank, F.S.B., as servicer, and Goldman Sachs Mortgage Company ("GSMC"), as owner.  (Docket Entry # 57, Ex. C). In September 2004, GSMC assigned the loans that were subject to the servicing agreement to GS Mortgage Securities Corp. ("GSMSC"), the assignor under an Assignment, Assumption and Recognition Agreement ("the assignment agreement").  (Docket Entry # 57, Ex. B).  Plaintiff filed the assignment agreement as part of the summary judgment record and neither party objects to the fact that it is not executed.  For purposes of summary judgment, therefore, this court will assume that it was executed. Under the assignment agreement, GSMSC assigned the loans to Deutsche as well as GSMSC's "rights under the Servicing Agreement."  (Docket Entry # 57, Ex. B).  Assuming that plaintiff's mortgage loan was listed in the attached mortgage loan schedule, Deutsche succeeded to the rights of GSMC under the servicing agreement.

loans that Deutsche purchased.  Although Deutsche had allowed a

number of loans in the pool to undergo HAMP review on "a case-by-

case basis," Deutsche had not issued "a blanket approval" and

opened up the entire pool to the HAMP program.  (Docket Entry #

57, Ex. D, pp. 24-28 & 30-31).

There is little, if any, indication that OneWest or IndyMac

Mortgage Services communicated with Deutsche or attempted to

obtain its prior written consent before denying the modification

in the July 16, 2010 letter.  Rock testified as follows at his

deposition:

> Q:  All right.  So in connection with Mrs. Johnson's
> application for modification, is it fair to say that as of
> July 16, 2010, the date of Exhibit 9, that there had been no
> communication between OneWest and Deutsche Bank regarding
> her application?
> A:  I don't think it's fair to say that.  I just don't know
> if – I don't – I am uncertain if – let me clear that up.  *I
> did not see any record or evidence of it to refer to in my
> review of the file.*

(Docket Entry # 57, Ex. D, pp. 9-10) (emphasis added).  Drawing

reasonable inferences in plaintiff's favor, IndyMac Mortgage

Services did not contact Deutsche to get its consent to a

modification of the mortgage loan.  After the final April 2010

payment under the TPP, plaintiff continued making payments of

$2,229.15 from May 1, 2010 through February 1, 2011.

On February 10, 2011, IndyMac Mortgage Services sent

plaintiff a letter offering a forbearance plan that required

three monthly payments of $1,675.78 due on March 1, April 1 and

May 1, 2011.  (Docket Entry # 41-8).  Two days later, on February 12, 2011, plaintiff signed and returned the forbearance plan to OneWest.  (Docket Entry # 40, ¶ 31) (Docket Entry # 61, p. 9).  As stated in the forbearance plan, it ended on May 1, 2011.  (Docket Entry # 41, Ex. I).

A few days later, IndyMac Mortgage Services sent plaintiff a letter stating that the mortgage loan was in default.  (Docket Entry # 41, Ex. I).  The letter informed plaintiff that, unless she cured the default within 150 days, the full balance would become due.  (Docket Entry # 40, ¶ 33).

Between March and November 2011, plaintiff made monthly payments of $1,675.78, i.e., the monthly amount due under the forbearance plan.  (Docket Entry # 53, Ex. A, ¶ 17).  Prior to September 22, 2011, IndyMac Mortgage Services "again suggested that [plaintiff] apply for" a loan modification.  (Docket Entry # 53, Ex. A, ¶ 20).  Thereafter, plaintiff submitted a "loan modification application to OneWest."  (Docket Entry # 40, ¶ 34) (Docket Entry #61, p. 10) (Docket Entry # 41, ¶ 32).  Deutsche did not approve the modification.  (Docket Entry # 40, ¶ 34) (Docket Entry # 61, p. 10) (Docket Entry # 41, ¶ 32).  In letters dated September 22 and 28, 2011, IndyMac Mortgage Services denied the application again "due to [its] contractual obligations with the owner of [plaintiff's] loan."  (Docket Entry ## 41-10 & 41-11).

"OneWest then reviewed" the "loan again to determine if [plaintiff] was eligible for a modification program other than HAMP." (Docket Entry # 40, ¶ 36) (Docket Entry # 61, p. 10) (Docket Entry # 41, ¶ 34). By letter dated October 18, 2011, IndyMac Mortgage Services denied a non-HAMP modification because plaintiff failed to meet various conditions. (Docket Entry # 41-12). The letter advised plaintiff that there were no other loan modification options available at that time. (Docket Entry # 41-12) (Docket Entry # 40, ¶ 37) (Docket Entry # 61, p. 11) (Docket Entry # 41, ¶ 35).

On October 6 and 14, 2011, IndyMac Mortgage Services sent plaintiff two more notices of default. The letters informed plaintiff that she had 150 days to cure the default by paying the past due amount and, in the event she failed to make such a payment, the mortgage holder might foreclose on the property. (Docket Entry ## 1-11 & 1-13).

## DISCUSSION

OneWest moves for summary judgment on all three counts in the complaint. With respect to Count I, OneWest maintains that it did not breach the TPP because plaintiff was not eligible for a permanent loan modification due to the absence of prior written consent by Deutsche. As to Count II, OneWest argues that it acted in accordance with the terms of the TPP and, because the covenant of good faith and fair dealing is only as broad as the

contract itself, the count is subject to summary judgment.[14]
OneWest seeks summary judgment on Count III because its conduct
was neither unfair nor deceptive and plaintiff did not suffer any
injury or damages arising from its conduct.

## I.  Breach of Contract Claim

Relying on paragraph 2(G) of the TPP, OneWest contends that
the TPP requires an eligibility determination as a condition
precedent to a permanent loan modification.  OneWest further
reasons that Supplemental Directive 09-01[15] confirms that *after* a

---

[14]  The reply brief adds a new argument.  Specifically,
OneWest contends there is no evidence of "'bad faith or an
absence of good faith.'"  (Docket Entry # 58).  Although a
litigant may use a reply brief to clarify arguments previously
made or to respond to an argument an opposing party raises in an
opposition, ordinarily it is not appropriate to use a reply brief
to raise a new argument.  See United States v. Bradstreet, 207
F.3d 76, 80 n.1 (1st Cir. 2000) ("[w]hile a reply brief is not
the proper place to raise new arguments, it is proper for a court
to look there for clarification") (internal citations omitted);
accord Gove v. Career Systems Development Corp., 689 F.3d 1, 11
n.7 (1st Cir. 2012).  There is no reason why OneWest could not
have raised this argument in its opening brief.  In this court's
discretion, this court declines to consider it at this time.  See
CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc., 97 F.3d
1504, 1526 (1st Cir. 1996) (courts are "entitled to expect
represented parties to incorporate all relevant arguments in the
papers that directly address a pending motion"); see, e.g., U.S.
v. Isler, 429 F.3d 19, 30 (1st Cir. 2005) (finding "a related
argument that the district court erroneously applied the
guidelines standard rather than the statutory standard" in reply
brief and at oral argument "forfeited"); EEOC v. Aldi, Inc., 2008
WL 859249, at *5 n.6 (W.D.Pa. March 28, 2008); D'Aiuto v. City of
Jersey City, 2007 WL 2306791, at *4 n.1 (D.N.J. Aug. 8, 2007)
(declining to consider new argument raised in reply brief).
[15]  Supplemental Directive 09-01 (April 6, 2009) ("SD 09-
01"), https://www.hmpadmin.com//portal/programs/docs/ hamp_
servicer/sd0901.pdf.

servicer receives a signed TPP and related documents, the servicer "must review" the TPP and the related documents to verify the borrower's eligibility.  SD 09-01, p. 5.  Taking this reasoning a step further, OneWest posits that the eligibility review entails adhering to the servicing agreement which requires "prior written consent" from Deutsche.  Because Deutsche did not give prior written consent, plaintiff was therefore not eligible for a permanent modification, according to OneWest.  Accordingly, IndyMac Mortgage Services properly informed plaintiff that she did not qualify for a permanent loan modification because of its "contractual obligations with the owner of the loan" (Docket Entry # 53, Ex. A(7)).

Plaintiff contends that the TPP does not require or include a condition that the owner of the mortgage loan approve the modification.  Plaintiff submits that the TPP was a contract and she complied with all of its conditions.  IndyMac Mortgage Servicing[16] then breached the contract by not offering her a permanent loan modification and deeming her ineligible due to an undisclosed "condition" requiring the lender to consent to the permanent loan modification.

_____

[16]  As previously explained, plaintiff identifies the servicer as IndyMac Mortgage Servicing, the defendant in this action, whereas OneWest identifies the servicer as IndyMac Mortgage Services.  The TPP refers to the servicer as IndyMac Mortgage Services, a division of OneWest.

In order to establish a contract claim, "'the plaintiff must prove that a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiff sustained damages as a result of the breach.'" Young v. Wells Fargo Bank, N.A., 717 F.3d at 232 (internal brackets omitted).  For purposes of summary judgment, OneWest does not dispute the existence of a valid contract.  (Docket Entry # 58, p. 3 & n.4).  The parties however strongly dispute the existence of a breach.

In order to determine a breach, it is necessary to determine the terms and conditions of the TPP.  OneWest quotes and relies on the following language in section 2(G):

> I understand that the [TPP] is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of a Modification Agreement, and (iii) the Modification Effective Date has passed.  I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if the Lender determines that I do not qualify or if I fail to meet any one of the requirements under this Plan.

(Docket Entry # 1-2, § 2(G)).  OneWest also relies on language in the preamble stating that, "If I have not already done so, I am providing confirmation of the reasons I cannot afford my mortgage payment and documents to permit verification of all my income." (Docket Entry # 1-2, p. 1, ¶ 2).

Contracts "are interpreted according to their plain terms." Barclays Bank PLC v. Poynter, 710 F.3d 16, 21 (1st Cir. 2013).

17

"When the words of a contract are clear, they must be construed in their usual and ordinary sense." General Convention of New Jerusalem in the U.S. of America, Inc. v. MacKenzie, 874 N.E.2d 1084, 1087 (Mass. 2007); accord Barclays Bank PLC v. Poynter, 710 F.3d at 21. Words are not taken in isolation but rather "within the context of the contract as a whole." Barclays Bank PLC v. Poynter, 710 F.3d at 21. In the event of an ambiguity, a court may examine extrinsic evidence. General Convention, 874 N.E.2d at 1087; see Young v. Wells Fargo Bank, N.A., 717 F.3d at 231-232 & 237. "[E]xtrinsic evidence cannot be used to contradict or change the written terms, but only to remove or to explain the existing uncertainty or ambiguity." General Convention, 874 N.E.2d at 1087. Language is ambiguous when "'it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.'" Barclays Bank PLC v. Poynter, 710 F.3d at 21; Farmers Ins. Exchange v. RNK, Inc., 632 F.3d 777, 783 (1st Cir. 2011) ("'contract is only ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken'").

As noted at the bottom of pages one and three of the TPP, it is a "uniform instrument" (Docket Entry # 1-2) (capitalization omitted) that applies to borrowers seeking a permanent loan

modification under HAMP from loan servicers.  See Stagikas v. Saxon Mortg. Services, Inc., 795 F.Supp.2d 129, 133 (D.Mass. 2011) ("government created one uniform agreement," the TPP, "to be executed by servicers and eligible borrowers").  The First Circuit in Young interpreted certain provisions in the TPP, including section 2(G), in the context of a non-GSE mortgage.[17] See Young v. Wells Fargo Bank, N.A., 717 F.3d at 232-233.  A number of district courts in this circuit have also addressed the terms of TPPs.  See Belyea v. Litton Loan Servicing, LLP, 2011 WL 2884964, at *2-3, 7-8 (D.Mass. July 15, 2011) (denying motion to dismiss contract claim because TPP is enforceable contract); Bosque v. Wells Fargo Bank N.A., 762 F.Supp.2d 342, 348, 351-353 (D.Mass. 2011) (TPP is a contract for purposes of a breach of contract claim); Durmic v. J.P. Morgan Chase Bank, N.A., 2010 WL 4825632, at *1-4 (D.Mass. Nov.24, 2010) (denying motion to

---

[17]  "Because Fannie Mae and Freddie Mac are Government Sponsored Enterprises (GSEs), non-Fannie Mae, non-Freddie Mac loans are referred to as 'Non-GSE Mortgages.'"  Thomas v. U.S. Bank Nat. Ass'n, 474 B.R. 450, 453 (D.N.J. 2012); see generally Allen v. CitiMortgage, Inc., 2011 WL 3425665, at *1 (D.Md. Aug. 4, 2011) (whereas "HAMP is required for government-sponsored entities ('GSEs'), such as Fannie Mae and Freddie Mac, participation in HAMP is voluntary for non-GSEs").  HAMP contains different supplemental directives and guides depending upon whether the mortgage is owned by Fannie Mae or a non-GSE lender. SD 09-01 provides "guidance to servicers for adoption and implementation of [HAMP] for mortgage loans that are not owned or guaranteed by Fannie Mae or Freddie Mac (Non-GSE Mortgages)."  SD 09-01, p. 1.

dismiss breach of TPP claim because issue of TPP's material terms "is one of the parties' intent").

Although the background and circumstances in these cases may differ from those in the case at bar,[18] the terms of the TPP, at least those portions quoted in <u>Young</u>, are identical to the TPP plaintiff executed.  Plaintiff's TPP is a uniform instrument last revised in August 2009.  Young executed her TPP in October 2009. <u>Young v. Wells Fargo Bank, N.A.</u>, 717 F.3d at 230.  Uniform agreements or clauses are afforded "one uniform meaning rather than multiple inconsistent meanings."  <u>Kolbe v. BAC Home Loans Servicing, LP</u>, 738 F.3d 432, 436 (1st Cir. 2013).  Moreover, "Extrinsic evidence of the parties' unique intentions regarding a uniform clause is generally uninformative."  <u>Id.</u>  The interpretation of the TPP made by the First Circuit in <u>Young</u> therefore applies to plaintiff's TPP.  OneWest's attempt to distinguish <u>Young</u> (Docket Entry # 58, n.4) is not convincing.

Turning to the language in the TPP, the first sentence "states, in mandatory language," that, "'if [plaintiff] is in compliance with [this Trial Period Plan] and her representations

---

[18]  For example, different supplemental directives or HAMP guides may apply depending on the different time periods in which the parties executed a TPP.  Likewise, different directives and guides may apply depending on whether the mortgage was a GSE or non-GSE mortgage.  As explained below, these directives and guides may provide background information and provide a basis to construe an ambiguity in the TPP consistent with its language but they cannot alter unambiguous terms of a TPP.  <u>See Young v. Wells Fargo Bank, N.A.</u>, 717 F.3d at 237.

. . . continue to be true in all material respects, then the
Lender will provide her with a Home Affordable Modification
Agreement ('Modification Agreement'), as set forth in Section
3.'"[19] <u>Young v. Wells Fargo Bank, N.A.</u>, 717 F.3d at 234
(emphasis and brackets in original omitted).  Use of the words
"if" plaintiff complies "then the Lender" will provide plaintiff
with a modification agreement ordinarily creates a condition
precedent.  <u>See</u> <u>Massachusetts Port Authority v. Johnson Controls,</u>
<u>Inc.</u>, 766 N.E.2d 542, 544 (Mass.App.Ct. 2002) ("if the parties
intended that the giving of notice was a condition precedent to
trigger the indemnification provision, they could easily have
drafted contract language to so provide, through the use of words
such as . . . 'if'").  OneWest is therefore correct insofar as it
contends that the TPP sets out various conditions precedent to
its obligation to offer a modification agreement.

Section three, captioned "The Modification," sets out in
greater detail the conditions plaintiff needed to perform in
order for IndyMac Mortgage Services to send "a Modification
Agreement for [her] signature."  (Docket Entry # 1-2, § 3); <u>see</u>
<u>Young v. Wells Fargo Bank, N.A.</u>, 717 F.3d at 234 (describing

---

[19] As explained in footnote seven, "Lender" is a defined
term in the TPP.  It does not refer to Deutsche, the owner of the
mortgage loan.  Rather, it refers in this instance to the
servicer, IndyMac Mortgage Services, a division of OneWest.  The
third line of the TPP reads as follows:  "Lender or Servicer
('Lender'):  IndyMac Mortgage Services, a division of OneWest
Bank, FSB."  (Docket Entry # 1-2).

section three as "providing that if Young complies with certain
*conditions*," then the lender will send her a modification
agreement) (emphasis added).  The conditions are that "(1) my
representations in Section 1 were and continue to be true in all
material respects; (2) I comply with the requirements in Section
2; (3) I provide the Lender with all required information and
documentation; and (4) the Lender determines that I qualify . .
.."  (Docket Entry # 1-2, § 3).

The requirements in section 2(G) reiterate that, "the Loan
Documents will not be modified unless and until" plaintiff meets
"the conditions required for modification."  (Docket Entry # 1-2,
§ 2(G)).  The term "modification" receives the same meaning
throughout the TPP.  <u>See</u> <u>Barilaro v. Consolidated Rail
Corporation</u>, 876 F.2d 260, 265 n.10 (1st Cir. 1989) (recognizing
the "'general rule in the construction of a written instrument
that the same word occurring more than once is to be given the
same meaning unless a different meaning is demanded by the
context'") (quoting <u>Dana v. Wildey Savings Bank</u>, 2 N.E.2d 450,
453 (Mass. 1936)).  Reading section 2(G) together with the TPP's
first sentence and section three, which is captioned "The
Modification," it is apparent that the "conditions for
modification" in section 2(G) are those in section three.  In
addition to the "conditions for modification," section 2(G)
states that plaintiff must receive an "executed copy of the

Modification Agreement"[20] and "the Modification Effective Date
has passed." (Docket Entry # 1-2, § 2(G)). Section 2(G) also
repeats the "qualify" language in section three, to wit, that
"the Lender will not be obligated or bound to make any
modification . . . if the Lender determines that I do not qualify
. . .." (Docket Entry # 1-2, § 2(G)).

Section 2(F) adds the explicit condition that plaintiff must
make the periodic monthly payments to obtain a modification. It
reads as follows:

> If prior to the Modification Effective Date, (i) the Lender
> does not provide me a fully executed copy of this Plan and
> the Modification Agreement; (ii) I have not made the Trial
> Period payments required under Section 2 of this Plan; (iii)
> the Lender determines that any of my representations in
> Section 1 were not true and correct . . .; or (iv) I do not
> provide all information and documentation required by the
> Lender, the Loan Documents will not be modified and this
> Plan will terminate.

(Docket Entry # 1-2, § 2(F)). As noted above, section three
states the unambiguous condition that plaintiff "comply with the
requirements in Section 2." (Docket Entry # 1-2, § 3).

In sum, the TPP is a contract, as conceded by OneWest for
purposes of summary judgment (Docket Entry # 58, p. 3 & n.4),
that sets out certain conditions precedent that plaintiff must

---

[20]  Wisely, the parties do not argue that the absence of an
executed TPP by IndyMac Mortgage Services bars any modification
agreement from arising. See Wigod v. Wells Fargo Bank, N.A., 673
F.3d 547, 563 (7th Cir. 2012) (rejecting contention that Wells
Fargo could unilaterally withhold modification by not signing and
sending him a modification agreement).

fulfill to obtain a "Modification Agreement" for her signature. (Docket Entry # 1-2, p. 1, ¶ 1 & § 3). Those conditions are that: (1) the certified representations in section one "were and continue to be true"; (2) plaintiff makes all of the periodic payments; (3) plaintiff provides all of the information and documentation required by IndyMac Mortgage Services; and (4) IndyMac Mortgage Services determines that she qualifies for the modification. (Docket Entry # 1-2, §§ 1, 2(F), 2(G) & 3) (Docket Entry # 1-2, p. 1, ¶ 2).

Viewing the facts in plaintiff's favor, she did not violate sections 2(F)(ii) through (iv). She made all three periodic payments in a timely manner during the three month trial period. (Docket Entry # 57, pp. 50-51) (Docket Entry # 53, ¶ 8). Her representations in section one remained correct and she provided all of the information and documentation IndyMac Mortgage Services requested.[21] Hence, the only other requirement was a determination by IndyMac Mortgage Services that she qualified for the modification.

OneWest argues that plaintiff did not qualify and was not eligible for a modification because of the absence of the approval by Deutsche required under the servicing agreement. The

---

[21] In reviewing plaintiff's file maintained by OneWest, Rock testified there was "no way to tell" if plaintiff "would have obtained" a permanent loan modification if Deutsche "was open" to such a modification. (Docket Entry # 57, Ex. D).

language of the TPP however does not refer to or require investor approval.  Nowhere does the TPP reference a servicing agreement between an investor and a servicer.  In fact, the only documents identified in the TPP are the "Loan Documents" defined as the mortgage and the note.  Under the four corners of the TPP, OneWest's argument that the servicing agreement's written prior approval requirement allows it to avoid offering a modification agreement to plaintiff in the event she complies with the TPP's conditions is incorrect.  Examining the meaning of the terms "qualify" and "eligibility" confirms this interpretation.

The term "qualify" appears four times in the TPP and the term "eligibility" appears once in the TPP.  The second paragraph on page one states that plaintiff is providing "documents to permit verification of all of my income . . . to determine whether I qualify for the offer described in this Plan."  (Docket Entry # 1-2, p. 1, ¶ 2).  The same paragraph states that IndyMac Mortgage Services will send plaintiff a signed copy of this TPP "if I qualify for this Offer."  (Docket Entry # 1-2, p. 1, ¶ 2).  The next paragraph similarly connects the qualification determination to the documents plaintiff submits to verify her income.  It reads that, "all documents and information I have provided to [IndyMac Mortgage Services] pursuant to this [TPP], including documents and information regarding my eligibility for the program, are true and correct."  (Docket Entry # 1-2, §

1(E)).  The other two references to "qualify" are the conditions

in section 2(G) and three that IndyMac Mortgage Services

determine that plaintiff "qualify" for the modification.  (Docket

Entry # 1-2, §§ 2(G), 3).  Accordingly, under the language of the

TPP, the parties intended IndyMac Mortgage Services to use the

documents provided by plaintiff to determine if she qualified for

the modification as opposed to the servicing agreement between

IndyMac Mortgage Services and Deutsche and its requirement of

prior written consent.

In construing the terms of a TPP, it is appropriate to

examine the "extrinsic evidence" of "HAMP and its attendant

guidelines" to "resolve any ambiguities in the TPP." Young v.

Wells Fargo Bank, N.A., 717 F.3d at 237 (citing Cady v. Marcella,

729 N.E.2d 1125, 1129-30 (Mass.App.Ct. 2000)).  The terms

"qualify" and "eligibility" in the TPP (Docket Entry # 1-2, p. 1,

¶ 2, §§ 1(E), 2(G) & 3)) are not ambiguous with respect to

qualification or eligibility being dependent upon investor

consent in a servicing agreement.[22]  The TPP as a whole reveals

that the term "qualify" requires the servicer to examine and

determine whether a borrower qualifies based on the documentation

and information the borrower provides.  The TPP does not refer to

"a servicing agreement" and ordinarily a borrower's documentation

---

[22]  Whether the terms are ambiguous with respect to
conducting a standard modification waterfall or net present value
analysis is not before this court.

26

would not include an agreement between the servicer and the investor.  Accordingly, neither the term "qualify" nor "eligibility" imports a requirement of "prior written consent" of an investor contained in a servicing agreement.  Reference to the extrinsic evidence of either the cover letter or SD 09-01 is not appropriate to resolve an ambiguity that does not exist.

OneWest additionally argues that the servicer undertakes the analysis of plaintiff's eligibility after the start of the trial period.  Relevant language in the TPP states that, plaintiff is "providing . . . documents to permit verification of all my income . . .."  (Docket Entry # 1-2, p. 1, ¶ 2).  The plain meaning of this language is that once plaintiff provides the documents, the servicer will verify her income.  Language in section 2(F) supports this construction because it clarifies that plaintiff may submit information and documentation prior to the Modification Effective Date, i.e., May 1, 2010, and the servicer may require information and documentation prior to that date.[23] It states that, "If prior to the Modification Effective Date . . . I do not provide all information and documentation required by

---

[23]  The TPP defines the "Modification Effective Date" as "the first day of the month following the month in which the last Trial Period Payment is due (the 'Modification Effective Date')." (Docket Entry # 1-2, p. 2, ¶ 4).  As noted in the factual background, plaintiff's Modification Effective Date was therefore May 1, 2010.

Lender, the Loan Documents will not be modified." (Docket Entry # 1-2, § 2(F)).

In the event there is any ambiguity, SD 09-01 confirms that, "When the borrower returns the Trial Period Plan and related documents, the servicer must review them to verify the borrower's financial information and eligibility – except that documentation of income may not be more than 90 days old as of the determination of eligibility." SD 09-01, p. 5. The directive also allows a servicer to initiate a TPP using a borrower's "verbal financial information." SD 09-01, p. 17; Wigod v. Wells Fargo Bank, N.A., 673 F.3d at 557. Consistent with IndyMac Mortgage Services' review, servicers were "not required to verify financial information prior to" the start "of the trial period." SD 09-01, p. 17; Wigod v. Wells Fargo Bank, N.A., 673 F.3d at 557. As done by IndyMac Mortgage Services in the case at bar, a servicer undertakes document review and verification once the borrower returns a signed TPP.[24]  See Bosque v. Wells Fargo Bank, N.A., 762 F.Supp.2d at 348 ("[t]he controlling supplemental directive anticipates that the servicer will verify the borrower's representations regarding their income during the trial period") (discussing SD 09-01).

---

[24]  "Treasury changed this policy in 2010, however, to allow servicers to offer a trial modification only after reviewing a borrower's documented financial information." Wigod v. Wells Fargo Bank, N.A., 673 F.3d at 557.

OneWest is therefore correct that a servicer's eligibility assessment of whether a borrower qualifies for a modification is a condition precedent to sending a modification agreement for the borrower's signature and the servicer ordinarily conducts the assessment after it receives the documents and information from the borrower.  The unambiguous terms of the TPP, however, establish that a servicer's determination of whether a borrower qualifies for a modification is not based upon an investor's prior written consent required in a servicing agreement.

Finally, "'Constructions that render contract terms meaningless should be avoided.'"  Jasty v. Wright Medical Technology, Inc., 528 F.3d 28, 36 (1st Cir. 2008) (quoting Summit Packaging Sys., Inc. v. Kenyon & Kenyon, 273 F.3d 9, 12-13 (1st Cir. 2001)) (internal brackets omitted).  If the TPP required prior written consent from an investor, an investor could withhold approval for any reason.  See generally Wigod v. Welss Fargo Bank, N.A., 673 F.3d at 563.  Such a provision would render the "mandatory language" in the first sentence of the TPP, Young v. Wells Fargo Bank, N.A., 717 F.3d at 234, superfluous.  See generally Wigod v. Welss Fargo Bank, N.A., 673 F.3d at 563.

Because investor approval was not required, a trier of fact could find that IndyMac Mortgage Services breached the TPP by not providing plaintiff a modification agreement for her signature and finding her not qualified because of the lack of prior

written consent from Deutsche.  Summary judgment on the contract claim is not warranted.

## II.  <u>Covenant of Good Faith and Fair Dealing</u>

In seeking to dismiss Count II, OneWest raises the familiar argument that the covenant "'may not be invoked to create rights and duties not otherwise provided for in the existing contractual relationship.'"  (Docket Entry # 39, § III(C)) (quoting <u>Agard v. Deutsche Bank Nat. Trust Co.</u>, 2012 WL 4498906, at *3 (D.Mass. Oct. 2, 2012)).  It also notes that the "covenant cannot 'create rights and duties not otherwise provided for in the existing contractual relationship.'"  (Docket Entry # 39, § III(C)) (quoting <u>Ayash v. Dana Farber Cancer Institute</u>, 822 N.E.2d 667, 684 (Mass. 2005), in parenthetical).  OneWest further submits that acting in accordance with the terms of an agreement is not a breach of the covenant.  (Docket Entry # 39, § III(C)).

According to OneWest, the TPP required it to determine plaintiff's eligibility.  When it could not obtain a waiver from Deutsche, it properly informed plaintiff that she did not qualify for a modification.  (Docket Entry # 39, § III(C)).  OneWest contends that the claim therefore "fails for the same reason her breach of contract claim fails:  the TPP did not require OneWest to offer [plaintiff] a permanent modification unless she was

eligible, and [plaintiff] did not establish her eligibility."
(Docket Entry # 58, p. 6, ¶ 2).[25]

As discussed in the prior section and for purposes of
summary judgment, IndyMac Mortgage Services did not act in
accordance with the terms of the TPP. It breached the TPP by
determining that plaintiff did not qualify for a permanent
modification due to contractual obligations with Deutsche,
specifically, the requirement in the servicing agreement to
obtain "prior written consent." Accordingly, OneWest's argument
does not warrant a dismissal of Count II.

III.  Chapter 93A

OneWest moves to dismiss the chapter 93A claim due to the
absence of unfair or deceptive conduct as well as causally
related damages or injury. Plaintiff argues that IndyMac
Mortgage Servicing never informed her that the loan pool that
included her loan was not open to modification before it denied
the modification on July 16, 2010. She complied with the terms
of the TPP and made all the monthly payments. IndyMac Mortgage
Servicing then denied the modification based on a contractual
obligation to Deutsche requiring prior written consent.

---

[25]  As previously explained, this court is not considering
the new argument raised in the reply brief (Docket Entry # 58, p.
6, ¶ 3) that plaintiff failed to offer any evidence of bad faith
or an absence of good faith. The above argument in the reply
brief (Docket Entry # 58, p. 6, ¶ 2) is a continuation of the
argument raised in the supporting memorandum (Docket Entry # 39).

Plaintiff also identifies the lost opportunity to extract equity from her home, a decrease in her credit scores and "interest charges and fees" as damages. (Docket Entry # 57, Ex. A, ¶¶ 22 & 24).

Chapter 93A "proscribes 'unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.'" Juarez v. Select Portfolio Servicing, Inc., 708 F.3d 269, 280 (1st Cir. 2013) (quoting chapter 93A, section 2). "'A practice is unfair if it is within the penumbra of some common-law, statutory, or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury.'" Young v. Wells Fargo Bank, N.A., 717 F.3d at 240 (chapter 93A claim alleging HAMP violations) (quoting Linkage Corp. v. Trustees of Boston University, 679 N.E.2d 191, 209 (Mass. 1997)); Commonwealth v. Fremont Investment & Loan, 897 N.E.2d 548, 556 (Mass. 2008). The "crucial factors" in determining whether an act or practice is "unfair" are "the nature of [the] challenged conduct" as well as the "purpose and effect of that conduct." Massachusetts Employers Ins. Exchange v. Propac-Mass, Inc., 648 N.E.2d 435, 438 (Mass. 1995). Evaluating unfairness may also entail examining "'[w]hat a defendant knew or should have known'" as well as a plaintiff's "'knowledge, and what he reasonably should have known.'" Incase Inc. v. Timex Corp., 488 F.3d 46, 57 (1st Cir.

2007) (quoting <u>Swanson v. Bankers Life Co.</u>, 450 N.E.2d 577, 580
(Mass. 1983)).  A practice is deceptive "'if it "could reasonably
be found to have caused a person to act differently from the way
he or she otherwise would have acted."'"  <u>Aspinall v. Philip
Morris Companies, Inc.</u>, 813 N.E.2d 476, 486 (Mass. 2004)
(brackets omitted).

It is well settled that a simple breach of contract does not
rise to the level of a chapter 93A violation.  <u>See</u> <u>Woods v. Wells
Fargo Bank, N.A.</u>, 733 F.3d 349, 358 (1ˢᵗ Cir. 2013) ("facts must
illustrate something beyond a mere good faith dispute, failure to
pay, or simple breach of contract"); <u>Juarez v. Select Portfolio
Servicing, Inc.</u>, 708 F.3d at 280 ("good faith disputes over
billing, simple breaches of contract, or failures to pay
invoices, for example, do not constitute violations of Chapter
93A").  Rather, the violation must have "'"an extortionate
quality that gives it the rancid flavor[s] of unfairness [and
deceptiveness]."'"  <u>Juarez v. Select Portfolio Servicing, Inc.</u>,
708 F.3d at 281 (brackets in original); <u>Robert E. Ricciardelli
Carpet Service, Inc. v. Home Depot U.S.A., Inc.</u>, 679 F.Supp.2d
192, 211 (D.Mass. 2010) ("[c]hapter 93A reaches only those breach
of contract cases that have an 'extortionate quality'").  Thus,
when a party to a contract "employs a breach of contract to gain
an unfair advantage over the other, the breach 'has an
extortionate quality that gives it the rancid flavor of

33

unfairness.'" Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d
at 55. Massachusetts courts consistently hold "that 'conduct in
disregard of known contractual arrangements and intended to
secure benefits for the breaching party constitutes an unfair act
or practice for c. 93A purposes.'" Id. (quoting Anthony's Pier
Four, Inc. v. HBC Associates, 583 N.E.2d 806, 821 (Mass. 1991)
(citation and internal quotation marks omitted).

As explained with respect to Count I, IndyMac Mortgage
Services, a division of OneWest, breached the TPP in July 2010 by
failing to send plaintiff a modification agreement for her
signature on the basis of its "contractual obligations with the
owner of [plaintiff's] loan." (Docket Entry # 41-7). IndyMac
Mortgage Services, however, did not breach the TPP to gain
unbargained for benefits or use the breach as a means to gain an
unfair advantage over plaintiff.

Examining the conduct as a misrepresentation, liability
under chapter 93A "will attach 'when there is a partial
disclosure, misrepresentation, or false statement.'" Underwood
v. Risman, 605 N.E.2d 832, 835 (Mass. 1993); see also V.S.H.
Realty, Inc. v. Texaco, Inc., 757 F.2d 411, 416-417 (1st Cir.
1985). Such circumstances fall sufficiently within the common
law concept of unfairness or deceit. See Commonwealth v. Fremont
Investment & Loan, 897 N.E.2d 548, 556 (Mass. 2008) ("practice
may be deemed unfair if it is 'within at least the penumbra of

some common-law, statutory, or other established concept of unfairness'"); Nei v. Boston Survey Consultants, Inc., 446 N.E.2d 681, 683 (Mass. 1983) (partial representation or half truth, without more, may constitute intentional fraud absent further explanation); see also Kiluk v. Select Portfolio Servicing, Inc., 2011 WL 8844639, at *4 (D.Mass. Dec. 19, 2011) ("[w]hether defendants had the contractual authority to execute [a permanent] modification is the sort of material fact that must be disclosed to avoid deceiving that other party") (addressing negligent misrepresentation claim on motion to dismiss). A number of courts in this district conclude that misrepresentations regarding a mortgagor's eligibility for a HAMP modification that compliance with a TPP would entitle the plaintiff to a permanent modification under HAMP survive motions to dismiss. See Okoye v. Bank of New York Mellon, 2011 WL 3269686, at *10 (D.Mass. July 28, 2011) (servicer's "alleged representation that it would be approved for permanent modification following successful completion of the TPP is sufficient" to survive dismissal); Belyea v. Litton Loan Servicing, LLP, 2011 WL 2884964, at *10 (allegations that plaintiffs "were led to believe that they would be entitled to a permanent loan modification or a denial of eligibility if they complied with their obligations under the TPP . . . 'are plainly sufficient to state a claim under ch. 93A for

unfair or deceptive practices'"); <u>Bosque v. Wells Fargo Bank,</u> <u>N.A.</u>, 762 F.Supp.2d at 353-354.

Chapter 93A liability is nevertheless absent in the event IndyMac Mortgage Services did not know about the prior written consent provision in the servicing agreement when it offered the TPP. <u>See</u> <u>Underwood v. Risman</u>, 605 N.E.2d at 835; <u>Incase Inc. v.</u> <u>Timex Corp.</u>, 488 F.3d at 57 (unfairness may involve assessing defendant's knowledge). Moreover, "Knowing requires more than negligence." <u>Id.</u>; <u>see</u> <u>Meyer v. Wagner</u>, 709 N.E.2d 784, 793 (Mass. 1999) (unfair or deceptive act requires more than negligence).

In the case at bar, the July 16, 2010 letter denied the modification because of IndyMac Mortgage Services' "contractual obligations with the owner," Deutsche, and because "HAMP requires the servicer to comply with the terms of their servicing contract with the owner of the loan." (Docket Entry # 41-7). Drawing reasonable inferences in plaintiff's favor, at the time it offered the TPP, IndyMac Mortgage Services knew it was subject to the servicing agreement and that the agreement required prior written consent from Deutsche to modify the mortgage loan when, for example, a modification lowers the monthly payment and thereby extends the final maturity date. A fact finder could conclude that IndyMac Mortgage Services nevertheless offered plaintiff a TPP thereby representing in a partial manner that if

plaintiff complied with the conditions in the TPP, it would provide her a modification agreement for her signature. It did not disclose the requirement of obtaining prior written consent from the owner of the mortgage loan as a condition to obtain a modification. IndyMac Mortgage Services also made no effort to obtain Deutsche's prior written consent during the three month trial period.[26] It then denied the modification on the basis that it had a contractual obligation to Deutsche.[27] Accordingly, a trier of fact could find that IndyMac Mortgage Services engaged in sufficiently unfair behavior when it offered the TPP knowing it required Deutsche's consent, failed to disclose the requirement of obtaining such consent and, instead, represented that if plaintiff complied with her end of the bargain, it would offer her a modification agreement for her signature. It then made no effort to contact Deutsche to obtain its consent and denied the modification because of the lack of consent.

---

[26] As previously explained, Rock did not see any evidence in plaintiff's loan file of a communication between OneWest and Deutsche. A reasonable inference therefore arises that IndyMac Services, a division of OneWest, did not attempt to contact Deutsche to obtain its approval for a modification.

[27] Marks' averments that Deutsche "did not authorize OneWest to offer Plaintiff a permanent loan modification" (Docket Entry # 41, ¶¶ 26 & 32), even if part of the summary judgment record, does not contradict Rock's testimony that his review of the loan file did not uncover any communication. Deutsche may not have authorized the modification for the simple reason that it was never asked.

Finally, servicer participation agreements between Fannie Mae and servicers of non-GSE mortgages require servicers to consider "all eligible mortgage loans unless prohibited by the rules of the applicable [pooling and servicing agreements] and/or other investor servicing agreements." SD 09-01, p. 1. The consent provision in the servicing agreement does not necessarily prohibit modification. Rather, it allows modifications that extend the final maturity date as long as the servicer obtains the lender's prior written consent. In fact, Deutsche had agreed to HAMP modifications for loans in mortgage pools on a case by case basis.

OneWest next asserts that plaintiff fails to show she suffered any injury or damages caused by the unfair or deceptive acts or practices. Chapter 93A provides a "right of action to any person 'who has been injured by another person's use or employment of any method, act or practice declared to be unlawful'" under the statute. <u>Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc.</u>, 840 N.E.2d 526, 532 (Mass. 2006); <u>Rule v. Fort Dodge Animal Health, Inc.</u>, 607 F.3d 250, 253 (1st Cir. 2010) ("chapter 93A provides a cause of action for a plaintiff who 'has been injured' by 'unfair or deceptive acts or practices'") (quoting sections 9(1) and 2(a) with citations omitted). After surveying Massachusetts case law, the First Circuit in <u>Rule</u> concluded that, "the most recent" Massachusetts

Supreme Judicial Court cases "appear to have returned to the notion that injury under chapter 93A means economic injury in the traditional sense." Rule v. Fort Dodge Animal Health, Inc., 607 F.3d at 255. Examples of such injuries in the context of a chapter 93A claim based on mishandling a forbearance agreement and a borrower's attempts to obtain a permanent loan modification under HAMP include a loss of equity in the borrower's "home and damage to her credit and her ability to obtain loans or credit in the future" as well as an "increase in interest rates she will have to pay on any existing or future loans and credit card accounts." Young v. Wells Fargo Bank, N.A., 717 F.3d at 241.[28] Chapter 93A economic injuries resulting from "allegedly deceptive representations about plaintiff's HAMP eligibility" thus consist of an "increased interest on the debt" and "a negative impact on plaintiff's credit history." Stagikas v. Saxon Mortg. Servs., Inc., 795 F.Supp.2d at 137 (finding such injuries sufficient to avoid motion to dismiss); see Young v. Wells Fargo Bank, N.A., 717 F.3d at 242 (quoting Stagikas v. Saxon Mortg. Servs., Inc., 795 F.Supp.2d at 137).

In the case at bar, plaintiff attests that she suffered a monetary loss in the form of "continuing interest charges and fees as the market has significantly declined since 2011."

---

[28] The defendant in Young represented to the court that "the foreclosure sale has not yet been scheduled." Id. at 231 n.2.

(Docket Entry # 53, Ex. A, ¶ 24).  She also avers that her "credit scores ha[ve] been falsely decreased making new financing difficult to obtain."  (Docket Entry # 53, Ex. A, ¶ 24).  Again drawing reasonable inferences in plaintiff's favor, the unfair conduct leading up to and including the July 2010 denial of a modification agreement caused plaintiff to experience a lowering of her credit score.  Such an injury suffices to avoid summary judgment irrespective of any alleged loss of equity in her home.[29]

<u>CONCLUSION</u>

In accordance with the foregoing discussion, the motion to strike paragraphs 12 and 26 (Docket Entry # 52) is **DENIED** as moot.  The summary judgment motion (Docket Entry # 38) is **DENIED**.  The deadline to file dispositive motions expired five months ago and will not be extended.  The parties will therefore appear for a status conference on May 20, 2014, at 2:30 p.m. to set a date for trial.


　/s/ Marianne B. Bowler　　　
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[29]  During her deposition, she attributed the loss in the value of her home to "the overall economy."  (Docket Entry # 42-1).  She also agreed that IndyMac Mortgage Services had not done "anything to cause a decrease in the value of [her] property."  (Docket Entry # 42-1).